UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

VALDO VAHER,

                              Plaintiff,

          - against -

TOWN OF ORANGETOWN, NEW YORK, and
KEVIN NULTY, jointly, severally and individually,

                              Defendants.

**OPINION AND ORDER**

10 Civ. 1606 (ER)

<u>Appearances:</u>

Alan Edward Wolin
Wolin & Wolin
Jericho, NY
*Attorney for Plaintiff*

John J. Walsh, II
Paul Edward Svensson
Hodges, Walsh & Slater, L.L.P.
White Plains, NY
*Attorneys for Defendants*

<u>Ramos, D.J.:</u>

　　　　Valdo Vaher ("Plaintiff") brings this action pursuant to 42 U.S.C. § 1983 against the

Town of Orangetown ("the Town") and Chief Kevin Nulty of the Orangetown Police

Department ("OPD") in his personal capacity ("Defendants").  Plaintiff maintains that

Defendants violated his constitutional rights under the First, Fourth, and Fourteenth

Amendments.  Amended Complaint ("Am. Compl.") (Doc. 10).  He seeks compensatory and

punitive damages for each alleged constitutional violation, and an order directing Defendants to

return property that was confiscated from his home as a result of a March 2007 search and

seizure, described below.  Am. Compl. at 24–25.

Defendants have moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.  (Doc. 62).  For the following reasons, Defendants' motion is GRANTED.

## I.  BACKGROUND

### A.  Factual Background

At all times relevant to this suit, Plaintiff was a federal police officer with the United States Department of Veteran Affairs ("VA"), residing in Orangetown, a town in Rockland County, New York.  Defendants' Response to Plaintiff's Additional Allegations ("Defs.' 56.1 Resp.") (Doc. 72) ¶¶ 49–50.[1]

While this action stems from several encounters between Plaintiff and various members of OPD starting in the early 2000s, Plaintiff's claims derive primarily from two events.  First, in March 2007, OPD executed a search warrant and seized ammunition and magazines from Plaintiff's home, which Plaintiff has never recovered ("2007 Search and Seizure").  Two years later, in March 2009, OPD responded to a dispute between Plaintiff and a contractor at Plaintiff's home, in which Plaintiff pulled his gun on the contractor in response to perceived threatening behavior ("2009 Incident").

---

[1] Under Rule 56.1 of the Local Civil Rules of the United States District Courts for the Southern and Eastern Districts of New York ("Local R. 56.1"), a party moving for summary judgment pursuant to Rule 56 must submit a "separate, short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried," and must cite admissible evidence in doing so.  Local R. 56.1(a), (c) & (d).  Rule 56.1 also requires a party opposing summary judgment to submit, with his or her opposition, a statement responding to each of the moving party's proposed undisputed facts, along with citations to admissible evidence. Local R. 56.1(b) & (d).  Here, Defendants submitted their statement containing forty-eight numbered paragraphs (Doc. 64), Plaintiff submitted his statement that both responded to each of Defendants' paragraphs and added an additional seventy-three numbered paragraphs as "additional allegations" (Doc. 70), and Defendants subsequently submitted a response to Plaintiff's additional numbered paragraphs (Doc. 72).  For ease of reference, and because the parties' responses to numbered paragraphs are relevant, the Court will refer to Plaintiff's Response to Defendants' Statement of Undisputed Material Facts Pursuant to Local Civil Rule 56.1 (Doc. 70) when citing ¶¶ 1–48 and responses thereto, and will refer to Defendants' Response to Plaintiff's Additional Allegations (Doc. 72) when citing ¶¶ 49–121 and responses thereto.

**1. Pre-2007 Search and Seizure**

In the early 2000s, Plaintiff was a member of the New York Army National Guard's 422nd Military Police Company, as was James Nawoichyk, who later became a Detective at OPD.  Defs.' 56.1 Resp. ¶¶ 51–52.  Plaintiff asserts that the two men had a tense relationship, primarily because Nawoichyk became suspicious about Plaintiff's previous work for the Estonian army.  *Id.*  Additionally, Plaintiff claims that Nawoichyk became interested in Plaintiff's collection of military firearms, but Plaintiff rebuffed Nawoichyk's requests to see the collection. *Id.* ¶ 53.  Plaintiff also asserts that he complained about Nawoichyk's treatment towards him to the New York National Guard's Inspector General Office and to the Commander of the 422nd Military Police Company.  *Id.* ¶¶ 53–56.  Plaintiff did not, however, file a formal written complaint or disciplinary proceeding against Nawoichyk while they served in the National Guard together.  *See* Affirmation of Paul E. Svennson (Doc. 63), Ex. C at 36–37, 85.[2]

**2. The 2007 Search and Seizure**

On March 7, 2007, Plaintiff lived with his mother in Orangetown, New York.  Defs.' 56.1 Resp. ¶¶ 58–59.  On that day, while Plaintiff was away attending military school in Fort Dix, New Jersey, Plaintiff's mother accidently locked herself out of the house and had to call a local locksmith.  *Id.* ¶¶ 61–62.  The locksmith managed to open a door to the garage, and when he looked inside the garage he saw what appeared to be seven or eight rifles, thousands of rounds of ammunition, and large, military-style ammunition boxes.  Ex. G at 2.  Plaintiff admits that at the time he had several military rifles and several thousand rounds of ammunition in the garage in plain view.  Ex. C at 100–02.  The locksmith alerted his boss to the large cache of firearms

---

[2] All further citations to Exhibits refer to those Exhibits attached to the Affirmation of Paul E. Svennson (Doc. 63).

and ammo in Plaintiff's garage, and the following day his boss contacted the Orangetown Police Department. *Id.*

In response, Nawoichyk, who was by then a Detective at OPD, and his partner, Detective Thomas Hoffman, went to Plaintiff's residence, where they spoke to Plaintiff's mother and asked her about the complaint OPD received from the locksmith. The parties dispute the tenor of this exchange and Plaintiff claims that the Detectives put his mother under duress, but whether coerced or not, it is undisputed that the mother eventually allowed Nawoichyk and Hoffman to look around the garage. Plaintiff's Response to Defendants' Statement of Undisputed Material Facts Pursuant to Local Civil Rule 56.1 ("Pl.'s 56.1 Resp.") (Doc. 70) ¶ 3; Defs.' 56.1 Resp. ¶¶ 65–66.

Inside the garage, Nawoichyk saw in plain view several rifles and military-style ammunition cans and containers, some of which contained belts of three or four rounds of ammunition linked together. Ex. H ¶¶ 9–10. While Plaintiff maintains that these rounds were not readily capable of being restored and linked together to form belts of 10 rounds or more, Ex. C at 152, they appeared to Nawoichyk to be so capable, Ex. H ¶ 11. Nawoichyk thus suspected that Plaintiff was in violation of New York Penal Law ("NYPL") § 265.02(8), Criminal Possession of a Weapon in the Third Degree, outlawing possession of a "large capacity ammunition feeding device," defined as "a magazine, belt, drum, feed strip, or similar device…that has a capacity of, or that can be readily restored or converted to accept, more than ten rounds of ammunition," § 265.00(23).[3]

---

[3] These iterations of the provisions were in effect in 2007 and up through their amendment on January 15, 2013. *See* Licenses and Permits—Weapons—Suspension or Revocation, 2013 Sess. Law News of N.Y. Ch. 1 (S. 2230) (McKinney's) (effective Jan. 15, 2013) (amending, *inter alia*, §§ 265.00(23), 265.02(8)).

After hearing about the incident from his mother, Plaintiff called Nawoichyk to explain that he had the requisite firearm licenses, and to warn Nawoichyk that Plaintiff would not consent to another search of his home.  Defs.' 56.1 Resp. ¶¶ 68–70.  On March 19, 2007, Plaintiff went into OPD in person to meet with Nawoichyk and Hoffman.  Plaintiff showed the Detectives his various firearm licenses.  In the course of that conversation, Plaintiff freely admitted that he owned a large capacity ammunition feeding device, but asserted that his licenses allowed him to do so legally.  Pl.'s 56.1 Resp. ¶ 5; Defs.' 56.1 Resp. ¶ 74; Ex. C at 115–16.

Three days later, after consulting with his supervisor, Detective Lieutenant McAndrew, and the local Assistant District Attorney, Nawoichyk prepared an affidavit and applied for a warrant to search Plaintiff's premises, based on a belief that Plaintiff was in violation of NYPL § 265.02(8).  Pl.'s 56.1 Resp. ¶ 8; Ex. H ¶ 2.  That same day, Justice Paul B. Phinney III of the Justice Court of the Town of Orangetown issued a warrant, pursuant to New York Criminal Procedure Law ("CPL") § 690, authorizing the search of Plaintiff's premises for "a large capacity ammunition feeding device that consist of ammunition, linked together by belt and links such that it can be readily restored and converted to accept more than ten rounds of ammunition."  Ex. I; Pl.'s 56.1 Resp. ¶ 10.  After receiving the search warrant, Nawoichyk, Hoffman, and McAndrew met to plan the coordination and execution of the search.  Pl.'s 56.1 Resp. ¶ 12; Defs.' 56.1 Resp. ¶ 78.

On March 26, 2007, Nawoichyk, Hoffman, and McAndrew, along with members of the United States Bureau of Alcohol, Tobacco, Firearms and Explosives (ATFE) and the Rockland County Sheriff's Department, executed the search warrant.  Defs.' 56.1 Resp. ¶¶ 80–81.  Plaintiff maintains (and Defendants deny) that the search was conducted in an "abusive and disrespectful manner," including the destruction of his property, threatening and insulting comments made by

officers at the scene, and one member of OPD, Officer Sila, drawing his gun on Plaintiff in a menacing fashion.  *Id.* ¶¶ 87–89, 91.  Plaintiff twice tried to call OPD Chief Nulty on the day of the search to complain, but could not reach him and did not leave a message.  Accordingly, Nulty never returned the calls.  *Id*. ¶ 84; Ex. C at 182.

The search team seized ten ammunition cans and boxes containing hundreds of ammunition belts with links of three and four rounds, one belt with thirteen linked rounds, and a number of high capacity magazines.  *See* Ex. J (Return Order listing seized items).  While Plaintiff attests that the three-round belts were broken such that one could *not* link them together with other rounds, he also testified that the thirteen-round belt appeared to be multiple three-round links attached together, which he had not yet taken apart despite an intent to do so.  *See* Ex. C at 151–55.

The following day, Justice Phinney signed the Return Order, which contained a list of items removed from Plaintiff's residence, and was delivered to Plaintiff several weeks later.  Pl.'s 56.1 Resp. ¶¶ 19–20; Defs.' 56.1 Resp. ¶ 94; Ex. J.  Upon filing the instant suit, Plaintiff now insists that the Return Order omitted two items that were seized, "a 20'' barrel length AR-15 rifle kit consisting of a barrel and two plastic bags and a green military ammunition box with hinges."  Defs.' 56.1 Resp. ¶ 95.  Plaintiff admits that he did not inform OPD of the missing rifle kit or ammunition box when he filed a formal complaint with OPD in January 2008, despite already having access to the Return Order.  Ex. C at 164.  Defendants deny taking the rifle kit and contend that all seized property was within the scope of the search warrant.

The parties do not dispute that Plaintiff was never arrested for weapons possession, and that his seized property was never returned.  Defs.' 56.1 Resp. ¶ 96.  The Return Order was issued pursuant to CPL § 690.55(1)(b) and directed OPD to "retain custody of the 10 listed items

6

seized" and "hold the same in a safe and secure place until such time as the court, or another court of competent jurisdiction, should direct the disposition or delivery of said items."  Ex. J.  It does not appear from the record that Plaintiff ever petitioned the Justice Court, or any other court, for an order directing the return of his property.

Following the search, Plaintiff contends, and Defendants deny, that Nawoichyk told officials at the 442nd Military Policy Company and the Department of Veterans Affairs that he believed Plaintiff was a "foreign spy and assassin" and a "member of the Estonian Army and terrorist."  Am. Compl. ¶¶ 50–52; Ex. C at 69.

As a result of the entire incident, on January 16, 2008, Plaintiff served a Notice of Claim ("2008 Notice of Claim") on OPD, alleging a violation of his civil rights pursuant to 42 U.S.C. § 1983.  Ex. N.  The 2008 Notice of Claim stated that Plaintiff never recovered his seized property, but it did not contain any allegation about a missing rifle kit or ammunition box.  *Id*.

Roughly a year after the 2008 Notice of Claim was served, Plaintiff claims he ran into Nawoichyk at a home improvement store, and Nawoichyk made a "rude and provocative" comment, telling Plaintiff he did not "have a case."  Defendants deny that this encounter took place.  *See* Defs.' 56.1 Resp. ¶ 100; Ex. C at 182–83.

### 3.  The 2009 Incident

Plaintiff's next encounter with OPD did not occur until March 3, 2009.  On that day, Plaintiff was engaged in a dispute with a contractor over work the contractor had done on Plaintiff's home.  The dispute escalated when Plaintiff refused to pay the contractor on the basis that the work done was deficient and not up to code.  Defs.' 56.1 Resp. ¶¶ 101–02.  According to Plaintiff, the contractor cursed at him and picked up a five-foot level, swinging it "in close

proximity" to Plaintiff's head, *id.* ¶ 104, while the contractor claims that he picked up the level in order to show Plaintiff that the work was adequate, Ex. L (Box 74).

Whatever the intent, the swinging level caused Plaintiff to call the OPD and retrieve a handgun from inside his house.  When he approached the contractor again, Plaintiff maintains that the contractor charged at him with the level and swung a steel tile cutter "in the vicinity" of Plaintiff's head, which then caused Plaintiff to pull his gun and order the contractor to halt. Defs.' 56.1 Resp.  ¶¶ 104–05.  Plaintiff admits that he pulled the gun because he felt he was being threatened with a deadly instrument.  *Id.* ¶ 109; Ex. C at 202–04.

Shortly thereafter, Officer Robert Sick arrived at Plaintiff's home, after being dispatched in response to Plaintiff's complaint.  Pl.'s 56.1 Resp. ¶ 29.  Sick first spoke with the contractor, who was waiting outside of Plaintiff's home, and got his side of the story, including a denial that he wielded a level in order to threaten Plaintiff.  Ex. L (Box 74); Pl.'s 56.1 Resp. ¶¶ 31–32.  Sick inquired whether the contractor wanted to file a charge against Plaintiff for "menacing," but the contractor declined and just wanted to be paid.  Pl.'s 56.1 Resp. ¶ 35.  Sick then spoke with Plaintiff, and the two men have conflicting accounts of that conversation.  Plaintiff claims that Sick "falsely accused him of menacing," did not give Plaintiff a chance to explain his side of the story,[4] and repeatedly threatened Plaintiff with the prospect of arrest and losing his home if he did not pay the contractor what was owed.  Defs.' 56.1 Resp. ¶ 108.  Sick denies making any such threats, but rather maintains that he told Plaintiff that the contractor would not press charges so long as he was paid, and Plaintiff voluntarily agreed to pay.  Pl.'s 56.1 Resp. ¶ 36; Ex. E at 42–45, 54–55.  Plaintiff admits that he paid, but says he only agreed to do so under duress. Defs.' 56.1 Resp. ¶ 110.

---

[4] When Sick later reported the details in his incident report, he included details from Plaintiff's characterization of events, and thus it appears that Plaintiff did have the opportunity to explain his side.  *See* Ex. L (Box 74).

Later that day, Sick wrote up and filed an incident report describing the events at Plaintiff's home.  Even though he was dispatched in response to the call placed by Plaintiff, Sick put "menacing" under the "Incident Type" category of the report form, and listed the contractor as the "Complainant/Victim" rather than Plaintiff.  Ex. L (Boxes 16, 26).  Plaintiff was listed as the "Person Reporting."  *Id*; Ex. E at 65–66.

Because Plaintiff had told Sick that he was a federal police officer for the Department of Veterans Affairs, Sick told his supervisor, Sergeant Bottari, about the incident, and Bottari then called Plaintiff's supervisors at the VA regarding the incident.  Pl.'s 56.1 Resp. ¶ 37.  Plaintiff asserts that as a result of this contact, he was "placed on modified duty," "ordered to undergo psychological testing," and was eventually terminated.  Defs.' 56.1 Resp. ¶ 111.  Plaintiff was reinstated only "after a hearing before the Merit Systems Protection Board."  *Id*.  Plaintiff concedes that he has no documentation of his termination or reinstatement.  Pl.'s 56.1 Resp. ¶ 39.

### 4. Post-2009 Incident

On March 11, 2010, Plaintiff alleges that an OPD officer pulled him over in his car and approached Plaintiff with his gun drawn and pointed at him.  The officer eventually told Plaintiff to leave, and Plaintiff felt "menaced and threatened as a result of this incident." Defs.' 56.1 Resp. ¶ 114.  Defendants deny that this incident occurred.

Plaintiff also recounts a number of similar encounters with Sick and other unidentified OPD officers up through 2013, alleging intimidating and intrusive behavior, such as shining bright lights into Plaintiff's home and car on multiple occassions.  *See* Defs.' 56.1 Resp. ¶¶ 113–21.  These allegations, however, are not in the Amended Complaint, have never been added to a supplemental complaint, and are relied upon for the first time in Plaintiff's opposition to

Defendants' motion for summary judgment. They will therefore not be considered by the Court for purposes of the instant motion.

### 5.  Orangetown Police Department

At all times relevant to this suit, Chief Kevin Nulty was the first in command at OPD and reported directly to the Town Board. Reporting directly to Chief Nulty was Captain Robert Zimmerman, second in command. Below Zimmerman were roughly six Lieutenants, including Detective Lieutenant McAndrew, head of the Detectives Bureau. Roughly a dozen Sergeants reported to the Lieutenants, and below them, Officers reported to the Sergeants. Detectives Nawoichyk and Hoffman reported directly to Det. Lt. McAndrew, who would regularly advise on applications for, and executions of, search warrants. *See* Pl.'s 56.1 Resp. ¶¶ 41, 45; Ex. F at 11–13.

Nawoichyk, Hoffman, and McAndrew did not report directly to Nulty. Pl.'s 56.1 Resp. ¶ 41. Nulty testified that his only knowledge of Plaintiff prior to Plaintiff's lawsuit was in regards to the 2009 Incident. *Id.* ¶ 42. Nulty does not know Plaintiff, never spoke or communicated with him directly, and does not recall receiving Plaintiff's calls during the 2007 Search and Seizure. *Id.* ¶ 43; Ex. F at 20–21. Nulty had no involvement in the application for, or execution of, search warrants, was not personally involved with the retention and return of seized property, and had no knowledge of any OPD policy of notifying employers when investigating the criminal conduct of one of its employees. Pl.'s 56.1 Resp. ¶¶ 44–47. Plaintiff either concedes these facts or lacks knowledge or information sufficient to form a belief as to their truth.

**B. Procedural Background**

Plaintiff commenced this action on March 1, 2010, by filing a Verified Complaint alleging various constitutional violations by Defendants the Town of Orangetown, the Orangetown Police Department, Kevin Nulty, James Nawoichyk, Thomas Hoffman, "John" Sullivan, and John Does 1–10.  (Doc. 1).  After encountering problems with serving Nawoichyk, Hoffman, and Sullivan, Plaintiff was granted leave to file an Amended Complaint and a Motion to Permit Late Service, which he did on October 26, 2010 (Doc. 10) and November 2, 2010 (Doc. 13), respectively.  The service issues continued over the next year, however, and this Court granted Plaintiff leave to file another motion for an extension of time for service and a motion to compel Defendants to provide the information necessary to complete service (Minute Entry dated Feb. 21, 2012), which Plaintiff filed on March 6, 2012 (Doc. 28).  On March 14, 2012, Defendants filed a motion to dismiss the Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).  (Doc. 33).

On January 2, 2013, this Court denied Plaintiff's request for a third extension of time to serve Nawoichyk, Hoffman, and Sullivan, and also denied Plaintiff's motion to compel without prejudice, for renewal during discovery.  *Vaher v. Town of Orangetown*, 916 F. Supp. 2d 404, 422 (S.D.N.Y. 2013).  The Court thus dismissed Plaintiff's claims against Nawoichyk, Hoffman, and Sullivan in their entirety, leaving the Town in its municipal capacity and Nulty in his personal capacity as the only remaining Defendants.[5]  *Id.*  The Court also dismissed Plaintiff's claims under the Second Amendment, the Fifth Amendment, and the Equal Protection Clause of the Fourteenth Amendment for failure to state a claim.  The Court denied Defendants' motion to

---

[5] The Court also dismissed the claims against OPD because it is an arm of the municipality without a distinct legal identity.  *Vaher*, 916 F. Supp. 2d at 412 n.1.

dismiss, however, with respect to Plaintiff's claims under the First Amendment, the Fourth

Amendment, and the Due Process Clause of the Fourteenth Amendment.  *See id*. at 426–41.

      Defendants filed their Answer on January 18, 2013.  (Doc. 42).  After completing

discovery, Defendants filed the instant motion on December 12, 2014.  (Doc. 62).

## II. LEGAL STANDARDS

### A.  Summary Judgment

      To prevail on summary judgment, the movant must show that "there is no genuine

dispute as to any material fact."  Fed. R. Civ. P. 56(a).  "An issue of fact is 'genuine' if the

evidence is such that a reasonable jury could return a verdict for the non-moving party."  *Senno

v. Elmsford Union Free Sch. Dist.*, 812 F. Supp. 2d 454, 467 (S.D.N.Y. 2011) (citing *SCR Joint

Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009)).  "A 'material' fact is one that

might 'affect the outcome of the litigation under the governing law.'"  *Id.*  "The function of the

district court in considering the motion for summary judgment is not to resolve disputed

questions of fact but only to determine whether, as to any material issue, a genuine factual

dispute exists."  *Kaytor v. Elec. Boat Corp*., 609 F.3d 537, 545 (2d Cir. 2010).  On a summary

judgment motion, the district court "may not make credibility determinations or weigh the

evidence.... 'Credibility determinations, the weighing of evidence, and the drawing of legitimate

inferences from the facts are jury functions, not those of a judge.'"  *Id.* at 545–46 (quoting

*Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)).

      The party moving for summary judgment is first responsible for demonstrating the

absence of any genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323

(1986).  Like here, where "the burden of proof at trial would fall on the nonmoving party, it

ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim." *Cordiano v. Metacon Gun Club, Inc.*, 575 F.3d 199, 204 (2d Cir. 2009) (citing *Celotex Corp.*, 477 U.S. at 322–23). If the moving party meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008) (citing *Celotex Corp.*, 477 U.S. at 322–23).

In deciding a motion for summary judgment, the Court must "'construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant.'" *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (quoting *Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 126 (2d Cir. 2004)). In opposing a motion for summary judgment, however, the non-moving party must do more than simply show "some metaphysical doubt as to the material facts" or rely on "factual arguments based on conjecture or surmise." *McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir. 2006) (citations and internal quotation marks omitted). To defeat a motion for summary judgment, "the non-moving party must set forth significant, probative evidence on which a reasonable fact-finder could decide in its favor." *Senno*, 812 F. Supp. 2d at 467–68 (citation omitted).

**B. Municipal Liability and Personal Liability Under Section 1983**

Plaintiff's constitutional claims against the Town are brought pursuant to 42 U.S.C. § 1983, in accordance with the Supreme Court's decision in *Monell v. Dep't of Soc. Servs. of N.Y.C.*, 436 U.S. 658 (1978). "[M]unicipalities may be sued directly under § 1983 for constitutional deprivations inflicted upon private individuals pursuant to governmental custom, policy, ordinance, regulation, or decision." *Batista v. Rodriguez*, 702 F.2d 393, 397 (2d Cir.

1983) (citing *Monell*, 436 U.S. at 690–91). "[T]o hold a [municipality] liable under § 1983 for the unconstitutional actions of its employees, a plaintiff is required to plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Id.* Thus, a *Monell* claim is not "a stand-alone cause of action under which a plaintiff may sue over a governmental policy, regardless of whether he suffered the infliction of a tort resulting from the policy…. Establishing the liability of the municipality requires a showing that the plaintiff suffered a tort in violation of federal law committed by the municipal actors and, in addition, that their commission of the tort resulted from a custom or policy of the municipality." *Askins v. Doe No. 1*, 727 F.3d 248, 253 (2d Cir. 2013) (citing *Monell*, 436 U.S. at 690–91).

> A plaintiff can prove the first "policy, custom, or practice" prong in one of four ways:
>
> (1) a formal policy officially endorsed by the municipality; (2) actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question; (3) a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware; or (4) a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees.

*Brandon v. City of New York*, 705 F. Supp. 2d 261, 276–77 (S.D.N.Y. 2010) (citations omitted). As for the second and third prongs, "Plaintiff must also prove a causal link between the policy, custom or practice and the alleged [constitutional] injury in order to find liability against a municipality." *Id.* at 277 (citing *Batista*, 702 F.2d at 397).

Plaintiff also brings claims against Chief Kevin Nulty in his personal capacity. Personal-capacity suits "seek to impose individual liability upon a government officer for actions taken under color of state law." *Hafer v. Melo*, 502 U.S. 21, 25 (1991). Such suits *must* be premised on a certain level of personal involvement. *See Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994)

14

("It is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.'") (quoting *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir. 1991)). "An individual cannot be held liable for damages under § 1983 'merely because he held a high position of authority,' but can be held liable if he was personally involved in the alleged deprivation." *Back v. Hastings on Hudson Union Free Sch. Dist.*, 365 F.3d 107, 127 (2d Cir. 2004) (quoting *Black v. Coughlin*, 76 F.3d 72, 74 (2d Cir. 1996)). A plaintiff can prove personal involvement with evidence that:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference…by failing to act on information indicating that unconstitutional acts were occurring.

*Id.* (citation omitted); *see also Grullon v. City of New Haven*, 720 F.3d 133, 139 (2d Cir. 2013). Additionally, "[w]hile the plaintiff in a personal-capacity suit need not establish a connection to governmental 'policy or custom,' officials sued in their personal capacities, unlike those sued in their official capacities, may assert personal immunity defenses…." *Hafer*, 502 U.S. at 25.


## III. DISCUSSION

### A. Fourth Amendment

Plaintiff first alleges that the 2007 Search and Seizure violated his rights under the Fourth Amendment. Am. Compl. ¶¶ 65–69; Pl.'s Mem. Opp'n Defs' Mot. Summ. J. ("Pl.'s Opp'n") 7–11. The Fourth Amendment protects "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," and provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly

describing the place to be searched, and the persons or things to be seized."  U.S. Const. amend.
IV.  The text of the Fourth Amendment "expressly imposes two requirements.  First, all searches
and seizures must be reasonable.  Second, a warrant may not be issued unless probable cause is
properly established and the scope of the authorized search is set out with particularity."
*Kentucky v. King*, 131 S. Ct. 1849, 1856 (2011) (citation omitted).

Plaintiff here does not contest that there was probable cause for the warrant to issue, but
rather focuses exclusively on the reasonableness of the search and seizure.[6]  He claims that the
2007 Search and Seizure was unreasonable because Defendants searched areas that were outside
the scope of the warrant, because Defendants seized property that was outside the scope of the
warrant, because Defendants conducted the search in a "disrespectful manner" and failed to
restore the premises to the condition it was in prior to the search, and because Defendants
procured the warrant in bad faith.  *See* Pl.'s Opp'n 7–11.

"A search is presumptively reasonable when executed pursuant to a warrant.  A search
warrant issued by a neutral magistrate, upon a finding of probable cause, must be afforded great
deference and creates a presumption that the officers executing the warrant acted in an
objectively reasonable fashion."  *Merriweather v. City of New York*, No. 12 CIV. 5258 (KPF),
2015 WL 57399, at *6 (S.D.N.Y. Jan. 5, 2015) (citations omitted); *see also United States v.
Murtaugh*, 382 F. App'x 83, 85 (2d Cir. 2010) ("Warrant-based searches are presumptively
reasonable.") (citing *Golino v. New Haven,* 950 F.2d 864, 870 (2d Cir. 1991)).  Warrant-based
searches, however, are restrained in scope by the terms of the warrant.  *See, e.g.*, *Walter v.*

---

[6] Plaintiff includes a single sentence in his opposition that could be construed as contesting whether the search
warrant issued with valid probable cause.  *See* Pl.'s Opp'n 10 ("The Town obtained the warrant, despite not
actually observing a band with 10 or more rounds.").  Given the arguments surrounding this sentence, and the lack
of challenge to probable cause in the Amended Complaint or anywhere else in the record, the Court doubts that
Plaintiff intended this sentence to challenge the Justice Court's probable-cause finding.  The argument is
abandoned, in any event.

*United States*, 447 U.S. 649, 656–57 (1980).  "The scope of a search pursuant to a valid warrant is defined by the warrant's description of the premises and the objects of the search, and by the places in which the officers have probable cause to believe those objects may be found." *United States v. Kyles*, 40 F.3d 519, 523 (2d Cir. 1994) (citing *Maryland v. Garrison*, 480 U.S. 79, 84 (1987)).  As such, "the Fourth Amendment does not authorize the seizure of items other than those identified in or reasonably covered by the terms of the search warrant, unless it is 'immediately apparent' that such items are contraband or illegal on their face.  *Merriweather*, 2015 WL 57399, at *7 (citing *Horton v. California,* 496 U.S. 128, 135–36 (1990)).  In addition, because "reasonableness" is "the touchstone" of the Fourth Amendment, "[e]xcessive or unnecessary destruction of property in the course of a search may violate the Fourth Amendment, even though the entry itself is lawful and the fruits of the search are not subject to suppression."  *United States v. Ramirez*, 523 U.S. 65, 71 (1998).

Plaintiff first argues that the search was unreasonable because Defendants searched the entire premises, including Plaintiff's bedroom dressers and closets, "despite the fact that the property they were seeking was clearly located in the basement/garage."  Pl.'s Opp'n 10–11; Defs.' 56.1 Resp. ¶ 88.  The text of the warrant, however, plainly authorized a search of Plaintiff's entire premises and nowhere purported to limit the search to the garage.  *See* Ex. I (authorizing search of "the premises described as 254 Betsy Ross Drive"); *see also United States v. Bershchansky*, 788 F.3d 102, 111 (2d Cir. 2015) (instructing the Court to "look directly to the text of the search warrant to determine the permissible scope of an authorized search") (citation omitted).  Even if the warrant did not explicitly provide for a search of the entire premises, because the warrant authorized the seizure of ammunition, the police "were accordingly permitted to look in any place within the premises where the subjects of the warrant…might be

17

found." *Merriweather*, 2015 WL 57399, at *10 (citations omitted); *see also United States v. Ross*, 456 U.S. 798, 820–21 (1982) ("A lawful search of fixed premises generally extends to the entire area in which the object of the search may be found and is not limited by the possibility that separate acts of entry or opening may be required to complete the search.  Thus, a warrant that authorizes an officer to search a home for illegal weapons also provides authority to open closets, chests, drawers, and containers in which the weapon might be found.").  A reasonable juror thus could not conclude that the search was unreasonable simply because it extended beyond the basement and garage.

Plaintiff next argues that Defendants violated his rights when they "seized material not subject to the search warrant and omitted certain other items that were seized."  Pl's. Opp'n 10.  Specifically, Plaintiff alleges that Defendants improperly seized "a 20'' barrel length AR-15 rifle kit consisting of a barrel and two plastic bags and a green military ammunition box with hinges."  Defs.' 56.1 Resp. ¶ 95.

Seizure of items outside the scope of a search warrant is unconstitutional, absent an exception to the Fourth Amendment's warrant requirement.  *Horton*, 496 U.S. at 139.  "Officials executing a warrant have some discretion, however, in interpreting the scope of the warrant."  *United States v. Salameh*, 54 F. Supp. 2d 236, 277 (S.D.N.Y. 1999) (citing *United States v. Marti,* 421 F.2d 1263, 1268 (2d Cir. 1970)), *aff'd*, 16 F. App'x 73 (2d Cir. 2001).  "Their interpretation of the scope of the warrant need not be 'hyper-technical,' but rather should be 'commonsensical.'"  *Id.* (citation omitted).  In addition to items explicitly listed in the warrant, the "plain view" exception to the warrant requirement "authorizes seizure of illegal or evidentiary items visible to a police officer whose access to the object has some prior Fourth Amendment justification and who has probable cause to suspect that the item is connected with

18

criminal activity."  *United States v. Gamble*, 388 F.3d 74, 76 (2d Cir. 2004) (citation and internal

quotation marks omitted).

The rifle kit was plainly not within the scope of the warrant.  Defendants do not claim as

much.  Instead, Defendants argue that the rifle kit was never seized, pointing to Plaintiff's lack of

documentary evidence establishing that he owned the kit, and to the fact that neither the Return

Order nor Plaintiff's 2008 Notice of Claim included mention of a rifle kit.[7]  Defs.' Mem. Supp.

Mot. Summ. J. ("Defs.' Mem.") 10–11.  Plaintiff testified under oath, however, that he purchased

the kit at a gun show two years prior to the search, and that Defendants seized the kit from the

back shelf of his garage.  Ex. C at 160–62.  Plaintiff also described the kit in detail.  *Id.*  A jury

would be entitled to credit such testimony.  Resolving all ambiguities and drawing all reasonable

inferences in favor of the Plaintiff, *Brod*, 653 F.3d at 164, there exists a genuine issue of material

fact as to whether the rifle kit was improperly seized from Plaintiff's home.

The same cannot be said for seizure of the green ammunition box.  It is commonsense

that the warrant authorized the officers at the scene to at least seize ammunition boxes that

contained linked ammunition rounds or large-capacity magazines.  *See* Doc. 63, Ex. I

(authorizing search for "a large capacity feeding device that consists of ammunition, linked

together by belt and links").  Based on his testimony that the green ammunition box was empty,

Ex. C at 157, Plaintiff's contention seems to be that the box was outside the scope of the warrant

because it did not contain *any* ammunition or magazines, though nowhere does he clearly

articulate such an argument.[8]  Regardless of whether a reasonable juror would credit such a

---

[7] It appears from the record that Plaintiff's first specific mention of the missing rifle kit was in his Amended
Complaint, filed on October 26, 2010.  Am. Compl. ¶ 43.  Plaintiff's initial Complaint, filed on March 1, 2010,
states only that members of the search party "confiscated property not subject of the search warrant [sic]."
Complaint (Doc. 1) ¶ 38.

[8] By failing to contest the seizure of the three ammunition boxes that contained magazines and ammunition, *see* Ex.
J (listing three seized boxes containing magazines and ammunition), Plaintiff concedes that the warrant covered at

"hyper-technical" interpretation of the warrant, it is also the case that the "plain view" exception allowed the seizure of the ammunition box as probative evidence. *Cf. Walczyk v. Rio*, 496 F.3d 139, 160 n.21 (2d Cir. 2007) (holding that seizure of "ammunition, gun clips, and related firearm paraphernalia" was permitted under plain-view doctrine where warrant simply authorized seizure of "firearms"); *United States v. Cooper*, 19 F.3d 1154, 1163 (7th Cir. 1994) (permitting warrantless seizure under plain-view doctrine of suspected drug dealer's empty ammunition box because the box was "not discovered in a vacuum" and an "ammunition box, unlike a cigar box, is probative of weapons possession and drug dealing").[9]

Next, Plaintiff argues that the search was unreasonable because it was done "in an abusive and disrespectful manner." Am. Compl. ¶ 42. These allegations fall into two general categories: excessive physical damage to Plaintiff's property, and insulting or threatening comments and gestures made by officers at the scene towards Plaintiff.[10] Neither is supported by evidence sufficient to create a genuine issue of material fact.

While "[e]xcessive or unnecessary destruction of property" in the course of an otherwise valid search "may violate the Fourth Amendment," *Ramirez*, 523 U.S. at 71, "it is well

---

least those ammunition boxes that in fact contained magazines and ammunition. It is not clear whether Plaintiff's argument is (a) that one of the three boxes on the Return Order, Ex. J, was actually empty when seized and thus outside the scope of the warrant, or (b) that the green ammunition box was in fact a *fourth* box, improperly seized and then omitted from the inventory list. Whichever way this ambiguity is resolved, the legal question remains whether the warrant authorized seizure of an empty ammunition box.

[9] The same analysis applies to seizure of ammunition rounds that Plaintiff claims "could not be linked together because they were broken." Pl.'s Opp'n 10. The officers on the scene found hundreds of three- and four-round ammunition belts. *See* Ex. J. They were not required to test whether each individual round could be readily restored and made capable of being linked into more than 10 rounds while standing in Plaintiff's garage. If not explicitly covered by the warrant, these ammunition rounds were at the very least probative evidence covered by the "plain view" doctrine.

[10] Two of these allegations do not involve any activity by any member of OPD: threats to handcuff Plaintiff and his mother made by ATF agents on the scene, and loud laughter at Plaintiff's property by Rockland Police Department officials. *See* Defs.' 56.1 Resp. ¶ 87. The Court will disregard these two allegations in its Fourth Amendment analysis because it is self-evident that Plaintiff cannot rely on them to sustain a *Monell* claim against the Town or a claim for individual liability against Nulty.

recognized that 'officers executing search warrants on occasion must damage property in order to perform their duty.'" *Cody v. Mello*, 59 F.3d 13, 16 (2d Cir. 1995) (quoting *Dalia v. United States*, 441 U.S. 238, 258 (1979)).  Indeed, "it is settled that some disarray in conducting a search, including the tangential destruction of items that could not contain the object of the search, does not state a claim of constitutional magnitude." *Dockery v. Tucker*, No. 97-CV-3584 (ARR), 2008 WL 2673307, at *10 (E.D.N.Y. June 26, 2008) (citing cases).  To prevail, Plaintiff must establish that Defendants acted "unreasonably or maliciously in bringing about the damage." *Cody*, 59 F.3d at 16 ("Mere negligence is not enough.") (citing *Daniels v. Williams*, 474 U.S. 327, 333–34 (1986));[11] *see also Green v. City of Mount Vernon*, No. 10-CV-707 (KMK), 2015 WL 1455701, at *14 (S.D.N.Y. Mar. 31, 2015) (requiring "more than ordinary disarray and damage incident to the execution of the warrant") (citation omitted).

Determining whether a particular instances of property damage was "unreasonable or malicious" is ordinarily not amenable to resolution at the summary judgment stage. *See, e.g.*, *Koller v. Hilderbrand*, 933 F. Supp. 2d 272, 279 (D. Conn. 2013) ("Applying the *Cody* standard to motions for summary judgment, courts in the District have been reluctant to resolve the issue at summary judgment.").  Nonetheless, where a "plaintiff has not produced any documentary evidence to support his allegations," such as photos of broken property, receipts documenting repairs, or sworn testimony attesting to specific damages, he fails to meet his burden to "set out specific facts showing a genuine issue for trial" and thus cannot survive a summary judgment motion. *Smith v. City of New York*, No. 04 Civ. 3286 (TPG), 2010 WL 3397683, at *13 (S.D.N.Y. Aug. 27, 2010) (quoting Fed. R. Civ. P. 56(e)), *aff'd sub nom. Smith v. Tobon*, 529 F.

---

[11] "Although *Cody* dealt with a due process claim, district courts in the Circuit have interpreted *Cody* as articulating the standard for Fourth Amendment violations as well." *Koller v. Hilderbrand*, 933 F. Supp. 2d 272, 278 (D. Conn. 2013) (citing *Dockery*, 2008 WL 2673307, at *10 n.8).

App'x 36 (2d Cir. 2013); *see also Lewis v. City of Mount Vernon*, 984 F. Supp. 748, 756

(S.D.N.Y. 1997) ("[P]laintiffs have presented no evidence that the officers wantonly damaged or

destroyed property or conducted the search in a manner inconsistent with its professed

purpose….Rather, the only inference that can be drawn is that the officers conducted a thorough

search, as they are permitted to do in executing a warrant."). That is the case here. Plaintiff

points to only one specific instance of interference with his property—Nawoichyk's admission

that he removed some crates from a closet and failed to return them to their original place. *See*

Defs.' 56.1 Resp. ¶ 89 (citing Ex. D at 89). Other than that, Plaintiff does not provide *any*

documentary or testimonial evidence to support his allegation that the search party "destroyed

and damaged items belonging to plaintiff" and "left the house in a state of disarray." *Id*. ¶ 91

(citing Am. Compl. ¶ 44). Plaintiff cannot rest solely on these allegations to establish a genuine

issue of material fact. *See Rogers v. Cartagena*, No. 10 Civ. 9285 (JPO), 2013 WL 1285169, at

*6 (S.D.N.Y. Mar. 28, 2013) (granting summary judgment because there was "no record

evidence to support" claims of property damage during search); *Pina v. City of Hartford*, No. 07-

CV-0657 (JCH), 2009 WL 1231986, at *8 (D. Conn. Apr. 29, 2009) ("Plaintiffs have put forth

no evidence of the destruction of property. [The executing officer] admits that personal property

was thrown around during the search…but there is no indication that the detectives damaged the

plaintiff's property beyond what was necessary to effectuate a complete search of the

apartment.") (internal citation and quotation marks omitted); *Lynch ex rel. Lynch v. City of

Mount Vernon*, 567 F. Supp. 2d 459, 469 n.5 (S.D.N.Y. 2008) ("As for the fact that the officers

emptied dresser drawers during the search, we do not doubt that this resulted in inconvenience to

plaintiffs, but the argument that it was a constitutional violation is baseless.") (citing *Lewis*, 984

F. Supp. at 756).

Nor can Plaintiff establish a genuine issue of material fact based on alleged threatening

conduct and disrespectful comments by officers at the scene.  Plaintiff's testimony that

Orangetown Police Officer Sila menaced him by drawing his gun "half out," Ex. C at 146, could

not lead a reasonable juror to conclude that the search was objectively unreasonable.  *See, e.g.*,

*Lynch*, 567 F. Supp. 2d at 468 ("We do not doubt that the presence of police officers with guns

drawn in their home was a traumatic experience for plaintiffs. But the officers' decision to draw

their weapons while searching the Residence for guns, drugs and a drug dealer was objectively

reasonable.").[12]  And while Plaintiff's dismay at the disrespectful comments allegedly made by

officers in the course of the search is understandable, Defs.' 56.1 Resp. ¶¶ 82, 87–88, Plaintiff

does not cite to any legal authority in arguing that disrespectful comments from police can render

a search objectively unreasonable under the Fourth Amendment, nor is the Court aware of any.

Finally, Plaintiff questions Defendants' good faith in procuring the search warrant,

implying a type of retaliatory motive for the search.  *See* Pl.'s Opp'n 9–10.  "[T]he subjective

motivations of the individual officers," however, "ha[ve] no bearing on whether a particular

[search or] seizure is 'unreasonable' under the Fourth Amendment."  *Spinelli v. City of New*

*York*, 579 F.3d 160, 167 (2d Cir. 2009) (quoting *Graham v. Connor*, 490 U.S. 386, 397 (1989)).

The relevant standard is *objective* reasonableness, and thus Plaintiff's "claim that one or more

---

[12] The Court notes that the particular circumstances of this search—the fact that the search was targeted only at magazines and ammunition, and the fact that Plaintiff was not posing a threat to the present officers or attempting to flee—would certainly counsel against particularly excessive or intrusive displays of force.  *See, e.g.*, *Bolden v. Vill. of Monticello*, 344 F. Supp. 2d 407, 419 (S.D.N.Y. 2004) (noting that the issuance of a warrant does not "authorize the use of force in excess of what is reasonably necessary to secure the premises").  Had Plaintiff set forth evidence that Sila actually took out his gun and used it to detain Plaintiff during the search, it is possible a genuine issue of material fact would exist.  But the only evidence on this point—Plaintiff's own testimony—shows that Sila only drew his gun "half out" when Plaintiff headed "into the bathroom area" in order to call the National Rifle Association's legal department, which Plaintiff concedes he was freely allowed to do.  Ex. C at 145–46.  It is thus undisputed that Sila did not even "detain" Plaintiff in any real sense.

23

officers had an ulterior motive for the search is irrelevant to the issue of whether the search itself violated the Fourth Amendment." *Id.*

Since there remains a genuine issue of material fact only as to whether Defendants improperly seized Plaintiff's rifle kit, the Court proceeds to discuss whether Plaintiff can hold the Town or Nulty liable for this constitutional violation.

### (i) Municipal Liability

Unable to demonstrate any explicit policy that was causally related to the seizure of his rifle kit, *see, e.g.*, *City of Canton v. Harris*, 489 U.S. 378, 385 (1989) (requiring a "direct causal link between a municipal policy or custom and the alleged constitutional deprivation"), Plaintiff argues that the Town can be held liable for two reasons.  Neither theory, however, is supported by the record.

First, Plaintiff maintains that he "has presented sufficient evidence establishing that the March 2007 encounter and the March 2009 encounter were part of a pattern, practice, policy and custom of the Town to harass, target and intimidate [him]."  Pl.'s Opp'n 4.  Defendants retort that, at least with respect to the Fourth Amendment claim, Plaintiff "has not identified any Town-wide custom or policy to target, harass or intimidate [him] *in March 2007*."  Defs.' Rep. Mem. Supp. Mot. Summ. J. ("Defs.' Rep.") 11 (emphasis added).  The Court agrees with Defendants.

A municipality may be liable under *Monell* for a "custom" that is so widespread as to have the force of law, even though it has "not received formal approval through the body's official decision-making channels."  436 U.S. at 691; *see also Sorlucco v. N.Y.C. Police Dep't*, 971 F.2d 864, 870–71 (2d Cir. 1992).  Here, however, no reasonable juror could conclude that OPD had a custom of harassing Plaintiff in place *prior* to executing the search warrant, which is

24

the only way in which such a custom could fairly be described as the "moving force" behind violations occurring during the 2007 Search and Seizure. *See Roe v. City of Waterbury*, 542 F.3d 31, 37 (2d Cir. 2008) (requiring plaintiff to "demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the alleged injury") (quoting *Bd. of Cty. Comm'rs v. Brown*, 520 U.S. 397, 404 (1997)).  Indeed, Plaintiff justifies its "custom" argument with allegations describing conduct that occurred at least two years after the 2007 Search and Seizure. *See* Pl.'s Opp'n 4 (citing Defs.' 56.1 Resp. ¶¶ 113–21).  The record contains no evidence that anyone in OPD besides Nawoichyk even knew who Plaintiff was in March 2007, which falls far short of the requisite evidence of a "longstanding practice or custom which constitutes the 'standard operating procedure' of the local governmental entity" or a practice "so widespread as to have the force of law." *Jeffes v. Barnes,* 208 F.3d 49, 61 (2d Cir. 2000) (quoting *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989); *Brown*, 520 U.S. at 404).

Next, Plaintiff argues that the "involvement and participation of Detective Lieutenant McAndrew" in the 2007 Search and Seizure "is sufficient to bind the Town," because McAndrew "had the final decision making authority with reference to the procurement of the warrant" and "actually participated in the events."  Pl.'s Opp'n at 5.  Defendants respond that McAndrew was not a final policymaker and thus his involvement in the search cannot lead to liability for the Town itself under *Monell*.  Defs.' Rep. 5–8.

In order to hold a municipality liable for a "single decision by [a] municipal policymaker[]," *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986), a plaintiff must demonstrate the decisionmaker's "final policymaking authority" over the specific area of government behavior that is being challenged. *See City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988) (requiring that "the challenged action" be "taken pursuant to a policy adopted by the

official or officials responsible under state law for making policy *in that area of the city's business*") (emphasis added).  "Whether an official has final policymaking authority is a legal question, determined on the basis of state law."  *Roe*, 542 F.3d at 37.

"As a matter of New York law, the town board and police board 'are the only entities which may be considered responsible for establishing rules and regulations pertaining to police conduct.'"  *Green*, 2015 WL 1455701, at *32 n.13 (quoting *Polite v. Town of Clarkstown,* 120 F. Supp. 2d 381, 384–85 (S.D.N.Y. 2000)).  Plaintiff cannot assert municipal liability against the Town under § 1983 "based on the status of police officers as policymaking officials."  *Polite*, 120 F. Supp. 2d at 385 (citing New York Town Law § 150).  Plaintiff thus cannot hold the Town liable simply because McAndrew was a high-ranking OPD official and supervised this particular search and seizure.  *See Green*, 2015 WL 1455701, at *27 ("Although Plaintiffs allege that Scott was supervising the search, they do not allege any facts that would allow the Court to plausibly infer that Scott was a final policymaker….[or] had final policymaking authority with respect to how Mount Vernon police officers were to carry out searches.") (citations omitted).

Additionally, Plaintiff has not even *alleged* a "deliberate choice to follow a course of action" by McAndrew, *Pembaur*, 475 U.S. at 483, let alone created a genuine issue of material fact as to whether McAndrew made an explicit decision or order to seize the rifle kit.  There is thus no way for Plaintiff to prove that McAndrew's deliberate choice *caused* the rifle kit to be seized, which is an essential element of Plaintiff's claim.  *See Jeffes*, 208 F.3d at 61 (requiring proof that "the official who is a final policymaker in the area directly committed or commanded the violation of the plaintiff's federal rights or…indirectly caused the misconduct of a subordinate municipal employee") (citation omitted).

**(ii) Personal Liability**

The same is true for Plaintiff's claim against Chief Nulty in his personal capacity. Plaintiff does not point to any evidence contradicting Nulty's testimony that he had no knowledge of the 2007 Search and Seizure, that he did not participate in the application or execution of the search warrant, and that he had no involvement in the retention or return of seized property. *See* Ex. F at 25–34; Pl.'s 56.1 Resp. ¶¶ 42, 44, 46. Plaintiff thus has no proof that Nulty "participated directly" in the seizure of the rifle kit or "created a policy or custom" that allowed the seizure to occur. *Back*, 365 F.3d at 127; *see also Terebesi v. Torreso*, 764 F.3d 217, 234 (2d Cir. 2014) ("In this Circuit, a 'direct participant' includes a person who authorizes, orders, or helps others to do the unlawful acts, even if he or she does not commit the acts personally.") (citing *Provost v. City of Newburgh*, 262 F.3d 146, 155 (2d Cir. 2001)), *cert. denied*, 135 S. Ct. 1842 (2015). Furthermore, Plaintiff's testimony that he called Nulty twice during the 2007 Search and Seizure does not create a genuine issue of material fact as to whether Nulty "failed to remedy" a reported constitutional violation, was "grossly negligent" in his supervision, or "exhibited deliberate indifference," *Back*, 365 F.3d at 127, because there is no evidence that Nulty received *any* information about the incident given Plaintiff's failure to leave a message. *See* Defs.' 56.1 Resp. ¶ 85; Ex. C at 182 (Plaintiff's testimony that he failed to leave Nulty a message); Ex. F at 25, 28–29 (Nulty's testimony that he did not hear about the seizure until Plaintiff filed the instant suit). Absent facts demonstrating that Nulty "knew or should have known of the events of which [Plaintiff] complains[,]…there is no basis for a jury finding of gross negligence (or deliberate indifference), and summary judgment is proper." *Colon v. Coughlin*, 58 F.3d 865, 873–74 (2d Cir. 1995).

Despite raising a genuine issue of material fact as to whether his rifle kit was improperly seized, therefore, Plaintiff cannot hold the Town or Chief Nulty liable for that possible constitutional violation on the record before this Court.

## B. First Amendment Retaliation

Plaintiff alleges that Defendants have subjected him "to harassment, discriminatory actions and other retaliation" as a result of his "protests, complaints, comments and opposition," including the 2008 Notice of Claim.  Am. Compl. ¶ 78.  While Defendants argue that Plaintiff has failed to identify specific instances of retaliation that were causally related to Plaintiff's exercise of free speech, *see* Defs.' Mem. 12–15, Plaintiff's response consists exclusively of identifying specific instances of protected speech and repeating the Court's prior holding that chilled speech is not the only type of retaliation injury, *see* Pl.'s Opp'n 11–12.  Plaintiff does not provide any concrete evidence or arguments supported by legal authority to establish Defendants' intent to retaliate against him for engaging in protected speech.  Summary judgment is thus granted on Plaintiff's First Amendment claim.

"[T]he law is settled that as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions…for speaking out." *Hartman v. Moore,* 547 U.S. 250, 256 (2006).  "A plaintiff asserting a First Amendment retaliation claim must establish that: '(1) his speech or conduct was protected by the First Amendment; (2) the defendant took an adverse action against him; and (3) there was a causal connection between this adverse action and the protected speech.'" *Matthews v. City of New York*, 779 F.3d 167, 172 (2d Cir. 2015) (quoting *Cox v. Warwick Valley Cent. Sch. Dist.*, 654 F.3d 267, 272 (2d Cir. 2011)); *see also Gagliardi v. Vill. of Pawling*, 18 F.3d 188, 194 (2d Cir. 1994) (requiring plaintiff to

prove that "defendants' conduct was motivated by or substantially caused by his exercise of free speech").

"Specific proof of improper motivation is required in order for plaintiff to survive summary judgment on a First Amendment retaliation claim." *Curley v. Vill. of Suffern*, 268 F.3d 65, 73 (2d Cir. 2000) (citing *Blue v. Koren*, 72 F.3d 1075, 1082–83 (2d Cir. 1995)).   Direct evidence of retaliatory intent is not required, such that "circumstantial evidence may be…sufficient to raise a genuine issue of material fact precluding the grant of summary judgment." *Barrington v. New York*, 806 F. Supp. 2d 730, 747 (S.D.N.Y. 2011) (quoting *Gayle v. Gonyea*, 313 F.3d 677, 684 (2d Cir. 2002)).   Evidence of a retaliatory motive "may include expressions by the officials involved regarding their state of mind, circumstances suggesting in a substantial fashion that the plaintiff has been singled out, or the highly unusual nature of the actions taken." *Blue*, 72 F.3d at 1084.

Defendants do not dispute that the Plaintiff has engaged in protected speech.  Plaintiff's conduct—for example, the 2008 Notice of Claim—is plainly protected under the First Amendment.  *See Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals*, 282 F.3d 83, 91 (2d Cir. 2002) ("The rights to complain to public officials and to seek administrative and judicial relief from their actions are protected by the First Amendment.") (citing *Franco v. Kelly*, 854 F.2d 584, 589 (2d Cir. 1988)).

That said, no reasonable juror could conclude that Defendants acted with a retaliatory motive given the paucity of evidence.  Plaintiff nowhere contends that he has produced any direct evidence of intent, nor has the Court identified any, meaning Plaintiff relies exclusively on circumstantial evidence.  "Circumstantial evidence of retaliation may be found when defendants are aware that plaintiff has engaged in protected speech and defendants' challenged behavior

29

closely follows that protected speech." *Econ. Opportunity Comm'n of Nassau Cnty., Inc. v. Cty. of Nassau*, 106 F. Supp. 2d 433, 437 (E.D.N.Y. 2000); *see also Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009). None of the supposed retaliatory behavior that Plaintiff challenges, however, provides sufficient circumstantial evidence.

To start, Plaintiff implies that Nawoichyk and his OPD colleagues instigated the 2007 Search and Seizure based on Plaintiff's previous complaints about Nawoichyk during their time together in the National Guard. *See* Pl.'s Opp'n 9 ("This history could certainly have been a motivating factor in the Town's procurement of the warrant."). While Plaintiff testified that he submitted various complaints about Nawoichyk to the Office of Inspector General of both the state- and federal-level National Guard and to Plaintiff's company commander, *see* Defs.' 56.1 Resp. ¶¶ 53–56; Ex. C. at 36–37, 85–88, there is no evidence that Nulty or anyone else at OPD (besides Nawoichyk) had knowledge of these complaints.[13] *See Deal v. Seneca Cty.*, No. 07-CV-6497 (MAT), 2012 WL 13661, at *6 (W.D.N.Y. Jan. 4, 2012) ("To prove a causal connection, the plaintiff must demonstrate that the individuals who engaged in retaliation had knowledge of the protected conduct."). Furthermore, the challenged behavior took place over three years after the protected speech, rendering an inference of causation close to untenable. *See Morisseau v. DLA Piper*, 532 F. Supp. 2d 595, 617 & nn.141–42 (S.D.N.Y. 2008) ("While the Second Circuit has not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship, the weight of authority supports the view that ten or twelve months is too long.") (internal quotation marks omitted), *aff'd*, 355 F. App'x 487 (2d Cir. 2009). In contrast to Plaintiff's pure speculation about motive, there is the

---

[13] It is not even clear from the record that Nawoichyk himself knew of these complaints. Plaintiff admitted that he never filed a formal written complaint or disciplinary proceeding against Nawoichyk. *See* Ex. C at 36–37, 85.

*undisputed* existence of probable cause supporting the search warrant,[14] as well as the fact that

Nawoichyk and Hoffman instigated the search only after (i) they received a third-party complaint

from the locksmith, and (ii) Plaintiff admitted in person that he owned a large-capacity

ammunition feeding device, *see* Ex. C at 115–16.  In sum, Plaintiff provides no evidence that the

2007 Search and Seizure was retaliation for his previous speech.[15]

      While Plaintiff again exercised his free speech rights shortly after the 2007 Search and

Seizure by filing the Notice of Claim in January 2008, Ex. N, he cannot point to any adverse

action taken by OPD until the 2009 Incident, approximately fourteen months later, in March

2009.[16]  *See* Defs.' Mem. 12.  Here again, it was Plaintiff, and not OPD, that instigated this

interaction, when he reported a civilian complaint based on his altercation with the contractor.

Plaintiff points to various missteps that he believes Officer Sick took in responding to the

complaint, but nowhere does he dispute Sick's testimony that he had no knowledge of Plaintiff's

2008 Notice of Claim or any of his other previous complaints.  *See* Ex. E at 87–88.  Plaintiff's

offhand speculation that Sick had a "preconceived disposition" based on Plaintiff's earlier

---

[14] *See Smolicz v. Borough/Town of Naugatuck*, 281 F. App'x 32, 34 (2d Cir. 2008) (affirming summary judgment on plaintiff's retaliatory search claim based in part on probable-cause finding); *Allen v. City of New York*, No. 03 Civ. 2829 (GWG), 2007 WL 24796, at *22 (S.D.N.Y. Jan. 3, 2007) ("The Second Circuit has held…that no First Amendment retaliation claim based on an arrest and/or criminal prosecution is available where the prosecution at issue was supported by probable cause.") (citing *Mozzochi v. Borden*, 959 F.2d 1174, 1179–80 (2d Cir. 1992)).

[15] Plaintiff also alleges that he complained to Detective Lieutenant McAndrew and Nulty in the midst of the search of his home, but neither allegation rescues the First Amendment claim.  With respect to McAndrew, this is a mere allegation unsupported by any evidence.  *See* Defs.' 56.1 Resp. ¶ 83 (citing Am. Compl. ¶ 38).  With respect to Nulty, Plaintiff admitted he did not leave a voicemail, Ex. C at 182, and Nulty had no recollection of ever receiving the message, Ex. F at 25, 28–29.  Furthermore, Plaintiff alleges no adverse action that was specifically motivated by these particular complaints.

[16] Plaintiff testified that he had an unpleasant verbal exchange with Nawoichyk at a home improvement store in January 2009, but this does not represent an adverse action sufficient to sustain a claim of First Amendment retaliation.  *Cf. Scott v. City of New York Dep't of Correction*, 641 F. Supp. 2d 211, 231 (S.D.N.Y. 2009) ("[V]erbal abuse is typically insufficient to constitute an 'adverse employment action' because negative or otherwise insulting statements are hardly even actions, let alone 'adverse actions.'") (internal quotation marks omitted), *aff'd sub nom. Scott v. N.Y.C. Dep't of Correction*, 445 F. App'x 389 (2d Cir. 2011); *Bartley v. Collins*, No. 95 Civ. 10161 (RJH), 2006 WL 1289256, at *6 (S.D.N.Y. May 10, 2006) (holding that "verbal threats such as 'we going to get you, you better drop the suit,' do not rise to the level of adverse action").

encounters with OPD, Ex. C at 224–25, does not sufficiently describe a motive to retaliate *for the past exercise of free speech*, nor is it proof sufficiently "tangible" to create a genuine issue of material fact.  *See Cobb v. Pozzi*, 363 F.3d 89, 108 (2d Cir. 2004) ("[W]e have held that a plaintiff may not rely on conclusory assertions of retaliatory motive to satisfy the causal link. Instead, he must produce some tangible proof to demonstrate that [his] version of what occurred was not imaginary.") (citation and internal quotation marks omitted).  Likewise, there is no evidence that Sick or Sergeant Bottari intended to retaliate against Plaintiff for his previous speech when they alerted the Department of Veteran's Affairs about the 2009 Incident.[17]

Following the 2009 Incident, Plaintiff describes an altercation one year later, in March 2010, in which an unidentified officer pulled Plaintiff's vehicle over and pointed a gun at him multiple times, Defs.' 56.1 Resp. ¶ 114, but Plaintiff fails to proffer any direct or circumstantial evidence about the intent of this unidentified officer.  Plaintiff also testified to other instances of protected speech[18] and a number of additional encounters with unidentified OPD officers that have occurred since March 2010.  *See* Defs.' 56.1 Resp. ¶¶ 113–21.  Setting aside the fact that Plaintiff makes no effort to causally connect any instance of protected speech with any specific adverse action, the Court cannot consider these remaining facts on the instant motion because Plaintiff never moved to include them in a supplemental complaint, relying on them for the first time in his opposition to summary judgment.  *See, e.g.*, *Tomlins v. Vill. of Wappinger Falls Zoning Bd. of Appeals*, 812 F. Supp. 2d 357, 363 n.9 (S.D.N.Y. 2011) ("[T]he complaint may not

---

[17] Additionally, Plaintiff does not even attempt to establish that Sick's conduct during the 2009 Incident or Bottari's later communication the VA would bind the Town under *Monell* or Nulty in his personal capacity.  *See Jeffes*, 208 F.3d at 57–58 (putting burden on plaintiff to establish municipal liability).

[18] These are:  (i) a complaint to an unidentified Sergeant following a 2011 run-in with Sick, whom Plaintiff accused of intimidation, Defs.' 56.1 Resp. ¶ 115, and (ii) a complaint to an unidentified Lieutenant after yet another verbal encounter with Sick in a parking lot followed by Plaintiff's being tracked by an unmarked car, *id.* ¶ 119.

be amended simply by raising new facts in opposition to Defendants' motion"); *Kearney v. County of Rockland,* 373 F. Supp. 2d 434, 440–41 (S.D.N.Y. 2005) (collecting cases).

  The Court therefore grants summary judgment on Plaintiff's First Amendment claim.


### C. Fourteenth Amendment Procedural Due Process:  "Stigma Plus" Interest

  While the Court has previously struggled to discern the exact nature of Plaintiff's "liberty interest" claim, *see Vaher*, 916 F. Supp. 2d at 433, Plaintiff's opposition brief clarifies that he is pursuing a so-called "stigma plus" procedural due process claim.  *See* Pl.'s Opp'n 12–13 (citing *Paul v. Davis*, 424 U.S. 695, 701–02 (1976)).  A "stigma plus" claim "involves an 'injury to one's reputation (the stigma) coupled with the deprivation of some 'tangible interest' or property right (the plus), without adequate process.'"  *Segal v. City of New York*, 459 F.3d 207, 212 (2d Cir. 2006) (quoting *DiBlasio v. Novello*, 344 F.3d 292, 302 (2d Cir. 2003)).

  Plaintiff points to two instances of "stigma."  First, after the 2007 Search and Seizure, Nawoichyk told officials at the 442nd Military Policy Company and the Department of Veterans Affairs about the 2007 Search and Seizure, and accused Plaintiff of being a "foreign spy and assassin" and a "member of the Estonian Army and terrorist."  Am. Compl. ¶¶ 50–52; Ex. C at 68–69.  Second, in 2009, Officer Sick and Sergeant Bottari of OPD alerted an official at the VA about the 2009 Incident by faxing over a copy of the incident report, in which Sick categorized the incident as one of "menacing" and listed the contractor as the "Complainant/Victim" rather than Plaintiff.  *See* Defs.' 56.1 Resp. ¶¶ 110–11; Doc. 63, Ex. L (Box 74) (noting that incident report was faxed to the VA).

  As for the "plus," Plaintiff claims that he was "placed on modified duty and ordered to undergo psychological testing" and then terminated from the VA as a result of OPD's disclosure

of the 2009 Incident.  Defs.' 56.1 Resp. ¶ 111; *see also* Pl.'s Opp'n 12.[19]  Plaintiff also claims he

was "deprived of the right to quietly enjoy his home and to go about and conduct his business in

the community without police interference."  Pl.'s Opp'n 12–13.

"To prevail on a 'stigma plus' claim, a plaintiff must show (1) the utterance of a

statement 'sufficiently derogatory to injure his or her reputation, that is capable of being proved

false, and that he or she claims is false,' and (2) a material state-imposed burden or state-imposed

alteration of the plaintiff's status or rights."  *Sadallah v. City of Utica*, 383 F.3d 34, 38 (2d Cir.

2004) (quoting *Doe v. Dep't of Pub. Safety ex rel. Lee*, 271 F.3d 38, 47 (2d Cir. 2001)).  "The

state-imposed burden or alteration of status must be *in addition* to the stigmatizing statement.

Thus, even where a plaintiff's allegations would be sufficient to demonstrate a government-

imposed stigma, such defamation is not, absent more, a deprivation of a liberty or property

interest protected by due process."  *Id.* (citations and internal quotation marks omitted).

Furthermore, the "stigma" and the "plus" must be "sufficiently proximate."  *Velez v. Levy*, 401

F.3d 75, 89 (2d Cir. 2005).  "The sufficient proximity requirement 'will be satisfied where (1)

the stigma and plus would, to a reasonable observer, appear connected—for example, due to

their order of occurrence…and (2) the actor imposing the plus adopted (explicitly or implicitly)

those statements in doing so."  *Knox v. Cty. of Ulster*, No. 1:11-CV-0112 (GTS), 2013 WL

286282, at *5 (N.D.N.Y. Jan. 24, 2013) (quoting *Velez*, 401 F.3d at 89).

While Nawoichyk's description of Plaintiff as a "foreign spy" and "terrorist" may be

defamatory, Plaintiff has not alleged any adverse state action constituting a "plus" that is

"sufficiently proximate" to these 2007 statements.  *See Velez*, 401 F.3d at 89.  Plaintiff provides

no evidence of a specific deprivation of his liberty or property interest that is close in time or

---

[19] Plaintiff was eventually reinstated.  Defs.' 56.1 Stmt. ¶ 111.

origin to these statements, nor any deprivation that explicitly or implicitly "adopted" them.  *Id.*

Nawoichyk's statements therefore cannot serve as the basis for a "stigma plus" claim because, at

best, they are examples of mere stand-alone defamation.  *See Sadallah*, 383 F.3d at 38 ("[E]ven

where a plaintiff's allegations would be sufficient to demonstrate a government-imposed stigma,

such defamation is not, absent more, a deprivation of a liberty or property interest protected by

due process.") (citing *Siegert v. Gilley*, 500 U.S. 226, 233 (1991)).

Plaintiff's claim based on OPD's 2009 statements to the VA must also succumb to

summary judgment.  The simple reason is that Plaintiff has sued the wrong parties.  Plaintiff's

claim is that the VA did not provide *adequate process* before terminating him in a manner that

adopted OPD's stigmatic characterization of his role in the 2009 Incident.  *See Segal*, 459 F.3d at

213 ("Because stigma plus is a species within the phylum of procedural due process…the

plaintiff also must demonstrate that her liberty was deprived without due process of law.").  And

yet the VA—the state actor responsible for Plaintiff's temporary termination and any process

related to it—is not a party to this suit.  This omission proves fatal to Plaintiff's claim.

While "[t]here is no rigid requirement…that both the 'stigma' and the 'plus' must issue

from the same government actor or at the same time," the Second Circuit in *Velez v. Levy* held

that a "stigma-plus" claim is not cognizable against a state actor that issues the "stigma" but has

no legal control over the process provided in connection with the "plus."  *Velez*, 401 F.3d at 89,

93.  In *Velez*, school-board members allegedly made false statements about the plaintiff that were

endorsed by the School Chancellor's decision to terminate her.  The Second Circuit held that the

plaintiff could sue the Chancellor for depriving her "stigma-plus" liberty interest without due

process, but *could not* maintain a suit against the school board members because they did not

have "the power to provide process to the plaintiff."  *Velez*, 401 F.3d at 89–93; *see also Anemone*

*v. Metro. Transp. Auth.*, 410 F. Supp. 2d 255, 269–70 (S.D.N.Y. 2006) (explicating this aspect of

the Second Circuit's holding in *Velez*). Like the school board members in *Velez*, Defendants

here "did not undertake or oversee the investigation" into whether Vaher should be terminated

from the VA "and they could order neither pre-removal review nor post-removal remedies." *Id*.

There is no disputed issue of fact on this point. Thus, Defendants "cannot be held legally

accountable for the alleged process failure." *Id*.; *see also Orr v. Wisner*, No. 3:08-CV-953 (JCH),

2010 WL 2667918, at *7–8 (D. Conn. June 29, 2010) (relying on *Velez* to dismiss claim against

defendant who issued "stigma" but had no control over process related to the "plus"); *Anemone*,

410 F. Supp. 2d at 269–70 (same).[20]

Finally, Plaintiff's alleged deprivation of his right "to quietly enjoy his home and to go

about and conduct his business in the community without police interference" is not a sufficient

"plus." Pl.'s Opp'n 12–13. Because a "free-standing defamatory statement…is not a

constitutional deprivation, but is instead properly viewed as a state tort of defamation, the 'plus'

imposed by the defendant must be *a specific and adverse action clearly restricting the plaintiff's*

*liberty*…." *Velez*, 401 F.3d at 87–88 (emphasis added) (citation and internal quotation marks

omitted). "[T]he impact that defamation might have on job prospects, or, for that matter,

romantic aspirations, friendships, self-esteem, or any other typical consequence of a bad

reputation are not sufficient to meet the 'plus' prong of the test." *Ingber v. N.Y.C. Dep't of*

*Educ.*, No. 14-CV-3942 (JMF), 2014 WL 6888777, at *3 (S.D.N.Y. Dec. 8, 2014) (internal

quotation marks omitted). Plaintiff's highly abstract and generalized allegation, without specific

evidence of a tangible deprivation, falls short in exactly this manner. *See Ooley v. Citrus*

---

[20] Given the Second Circuit's holding in *Velez*, the Court need not consider whether OPD's characterization of the
2009 Incident as "menacing" and failure to report Plaintiff as the "Complainant/Victim" is sufficiently defamatory
and capable of being proved false to satisfy the first "stigma" prong.

*Heights Police Dep't*, No. 2:12-CV-00095 (JAM), 2013 WL 57018, at *6 (E.D. Cal. Jan. 3, 2013) (holding that "loss of quiet enjoyment" is not a sufficient "plus"), *aff'd*, 603 F. App'x 628 (9th Cir. 2015).[21]

The Court thus grants Defendants' motion for summary judgment as to Plaintiff's Fourteenth Amendment "stigma plus" interest claim.

### D. Fourteenth Amendment Substantive Due Process

Plaintiff next asserts that Defendants have violated his right to substantive due process under the Fourteenth Amendment.  Neither the Amended Complaint nor Plaintiff's motion papers adds much specificity to this claim.  The Court agrees with Defendants that "[r]ead most liberally, Plaintiff sets forth a claim that the 2007 seizure of his property, the 2009 intervention between [Plaintiff] and his contractor, or miscellaneous other alleged police conduct since 2009, caused him embarrassment and damage to his profession." Defs.' Mem. 15.  Defendants take the position that not only is this claim "covered" by Plaintiff's First Amendment, Fourth Amendment, and procedural due-process claims, but that in any event Plaintiff fails to produce an issue of fact as to whether he was subject to constitutionally arbitrary action at the behest of a municipal policy or Chief Nulty individually.  *Id.* at 15–18.

The Due Process Clause of the Fourteenth Amendment guarantees procedural protections from government action, but it also "cover[s] a substantive sphere as well, 'barring certain government actions regardless of the fairness of the procedures used to implement them.'" *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 840 (1998) (quoting *Daniels v. Williams*, 474 U.S. 327, 331 (1986)).  "[T]he substantive component of the Fourteenth Amendment's Due Process Clause

---

[21] In addition, it is not clear how this alleged deprivation "adopted" any of the stigmatic statements that Plaintiff alleges.  *See Velez*, 401 F.3d at 89 (requiring "stigma" and "plus" to be "sufficiently proximate").

forbids the government from burdening, in a constitutionally arbitrary way, an individual's property [or liberty] rights." *O'Connor v. Pierson*, 426 F.3d 187, 204 (2d Cir. 2005) (alteration in original). "To show a violation of substantive due process, plaintiff must: (1) identify the constitutional right at stake, and (2) demonstrate that the government action was conscience-shocking or arbitrary in the constitutional sense." *Little v. City of New York*, 487 F. Supp. 2d 426, 443 (S.D.N.Y. 2007) (citing *Lowrance v. Achtyl*, 20 F.3d 529, 537 (2d Cir. 1994)). "Mere irrationality is not enough: 'only the most egregious official conduct,' conduct that 'shocks the conscience,' will subject the government to liability for a substantive due process violation based on executive action." *O'Connor*, 426 F.3d at 203 (quoting *Lewis*, 523 U.S. at 846); *see also Kaluczky v. City of White Plains*, 57 F.3d 202, 211 (2d Cir. 1995) (describing substantive due process protection "against government action that is arbitrary, conscience-shocking, or oppressive in a constitutional sense, but not against a government action that is incorrect or ill-advised") (internal quotation marks omitted).

Again, Plaintiff's specific claim is opaque and it is not entirely clear what constitutional right he believes to be at stake. His opposition brief claims only a violation of "his right to substantive due process," without any more specification. Pl.'s Opp'n 13. Given the cases Plaintiff cites, however, it appears that he is arguing that "the conduct alleged states a substantive due process 'pattern of harassment' claim, citing *Chalfy v. Turoff*, 804 F.2d 20 (2d Cir. 1986), and its progeny." *Kastle v. Town of Kent, N.Y.*, No. 13 CV 2256 (VB), 2014 WL 1508703, at *9 (S.D.N.Y. Mar. 21, 2014).[22]

---

[22] While Plaintiff does cite other cases besides *Chalfy*, *see* Pl.'s Opp'n 13, none give the Court a better sense of what Plaintiff's specific substantive due-process claim is. *Cf. DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 196 (1989) (mother's suit against county social services for failure to respond to reports of child abuse); *Daniels v. Williams*, 474 U.S. 327, 332 (1986) (inmate's slip-and-fall suit against deputy sheriff); *Kaluczky v. City of White Plains*, 57 F.3d 202, 211 (2d Cir. 1995) (city employee's suit against mayor and administration for reducing his job duties); *Immediato v. Rye Neck Sch. Dist.*, 73 F.3d 454, 460 (2d Cir. 1994) (high school student and parents' suit against school district for mandatory community service program); *Lowrance v. Achtyl*, 20 F.3d

"[A] true pattern of harassment by government officials may make out a section 1983 claim for violation of due process of law." *Chalfy v. Turoff*, 804 F.2d 20, 22 (2d Cir. 1986). "Cases in which courts have upheld such claims, however, have involved 'systematic and intentional' conduct directed at the plaintiff.  Generally, defendants in such cases either acted illegally, or used their legal authority for a purpose other than that for which it was intended." *Contractors Against Unfair Taxation Instituted on New Yorkers v. City of New York* ("*C.A.U.T.I.O.N.*"), No. 93 CIV. 4718 (KMW), 1994 WL 455553, at *3 (S.D.N.Y. Aug. 19, 1994) (citing *Chalfy*, 804 F.2d at 22).

Defendants urge the Court to dismiss Plaintiff's claim because other constitutional Amendments provide more specific protection against the type of government behavior being challenged. *See* Defs.' Mem. 15–16 (quoting *Lewis*, 523 U.S. at 842).  Were Plaintiff's claim premised solely on the 2007 Search and Seizure, this position would be correct. *See, e.g.*, *Kastle*, 2014 WL 1508703, at *9 ("The Court concludes plaintiffs' claims are therefore substantially 'covered' by the Fourth Amendment (and by procedural due process protections with respect to the alleged evidence fabrication) and declines to expand the concept of substantive due process to encompass such conduct.").  But Plaintiff's claim is best understood as an assertion that the entire span of conduct set out in the Amended Complaint constitutes a single "true pattern of intentional, repeated, tortious harassment" by government officials. *Bertuglia v. City of New York*, 839 F. Supp. 2d 703, 719 (S.D.N.Y. 2012) (citing *Chalfy*, 804 F.2d at 22).  That individual episodes may invoke other constitutional provisions does not preclude the possibility that the

---

529, 537 (2d Cir. 1994) (inmate's suit against prison officials for administrative confinement pending disciplinary hearing); *Rosa R. v. Connelly*, 889 F.2d 435, 439 (2d Cir. 1989) (student's suit against school board for denial of credit for "time served" out of school during pending expulsion hearing).

broader history of harassment may be sufficiently coherent and systematic so as to "shock the conscience."

Ultimately, however, Plaintiff has not provided evidence sufficient for a reasonable juror to conclude that Defendants have systematically harassed him in a conscience-shocking way. Plaintiff concedes that he has never been issued any type of summons or citation by OPD.  Ex. C at 249.  Neither the 2007 Search and Seizure nor the 2009 Incident were instigated by OPD, and Plaintiff has not identified any state action during those events that could reasonably be described as "arbitrary, conscience-shocking, or oppressive," as opposed to merely "ill-advised." *Kaluczky*, 57 F.3d at 211; *see also Zulawski v. Holoway*, No. 3:05-CV-1815 (CFD), 2008 WL 5235340, at *3 (D. Conn. Dec. 15, 2008) ("[Plaintiff] admits that police who came to the property on several occasions were always there in response to complaints by neighbors, himself, or his employees.  Therefore none of these visits can meet the 'arbitrary or irrational' standard….").  Furthermore, as the Court previously concluded in the context of Plaintiff's First Amendment claim, the record is void of genuine issues of fact pertaining to the motives of the various officers that Plaintiff has come into contact with over the years.  *See O'Connor*, 426 F.3d at 203 ("[W]hether executive action shocks the conscience depends on *the state of mind* of the government actor and the context in which the action was taken.") (emphasis added).  Plaintiff also does not point to a single instance of actual physical violence by any member of OPD.  *Cf. Cruz-Erazo v. Rivera-Montanez*, 212 F.3d 617, 622–24 (1st Cir. 2000) (finding no sufficiently egregious or conscience-shocking actions where police officers' partook in repeated verbal harassment and threats of physical harm, but did not engage in physically intrusive or violent conduct that would "strike at the basic fabric" of a protected relationship, such as the parent-child relationship); *S.M. v. Lakeland Sch. Dist.*, 148 F. Supp. 2d 542, 547 (M.D. Pa. 2001)

("Those courts that have considered instances of psychological or verbal abuse by government actors have typically held that such conduct alone was not severe enough to qualify as a constitutional tort actionable under section 1983."), *aff'd sub nom. S.M. ex rel. L.G. v. Lakeland Sch. Dist.*, 33 F. App'x 635 (3d Cir. 2002); *Shabazz v. Cole*, 69 F. Supp. 2d 177, 200 (D. Mass. 1999) ("Without even a suggestion of physical injury, [state prison librarian's] verbal abuse and racial epithets, although continuing for a long period of time, fall short of conscience shocking conduct."); *Haussman v. Fergus*, 894 F. Supp. 142, 149 & n.20 (S.D.N.Y. 1995) ("[T]aunts, insults and racial slurs alleged to have been hurled at plaintiff by defendants, while reprehensible if true, do not comprise an infringement of constitutional guarantees.").[23]

Because "each determination of whether state conduct 'shocks the conscience' is necessarily fact-specific and unique to the particular circumstances in which the conduct occurred," *Cruz-Erazo*, 212 F.3d at 623, the Court stresses that its decision here turns most on the meager state of this specific record, rather than some generally applicable principle of law.[24] It is also worth noting, without deciding the issue, that Defendants are likely correct to argue that, on the basis of this record, Plaintiff could not establish either a policy of systemic harassment sufficient for municipal liability under *Monell* or a level of personal involvement sufficient to hold Nulty liable in his personal capacity.  *See* Defs.' Mem. 16.  In any event,

---

[23] Notably, Plaintiff does not cite to any cases with analogous facts that would lead the Court to conclude that the alleged pattern of behavior here is conscience-shocking.  While the citation to *Chalfy* helps determine the general contours of Plaintiff's claim, it too appears inapposite on a fact-specific level.  *See Bertuglia*, 839 F. Supp. 2d at 719 ("Intentional government harassment '*with the objective of driving plaintiffs out of business*' is the essence of a *Chalfy* claim.") (emphasis added) (quoting *C.A.U.T.I.O.N.*, 1994 WL 455553, at *3); *see also Schultz v. Inc. Vill. of Bellport*, No. 08-CV-0930 (JFB), 2010 WL 3924751, at *7–8 (E.D.N.Y. Sept. 30, 2010), *aff'd*, 479 F. App'x 358 (2d Cir. 2012).

[24] In the same vein, the Court notes that it has not considered all of Plaintiff's post-2010 allegations that are not in the Amended Complaint and are relied upon for the first time in Plaintiff's summary judgment papers.  *See Kearney*, 373 F. Supp. 2d at 440–41.  Even had those allegations been considered, they would not have created a genuine issue of material fact, given the failure to identify the officers involved and the generalized, hazy details of those encounters.

Defendants' motion for summary judgment on Plaintiff's substantive due-process claim is granted.

### E.  Fourteenth Amendment Procedural Due Process:  Property Interest

Plaintiff contends that Defendants violated his constitutional right to procedural due process because they "adopted, promulgated and implemented a policy and practice of deliberately depriving plaintiff of his personal property without providing him with a remedy to recover that property."  Am. Compl. ¶ 101.  According to Plaintiff, once Defendants knew that he was not going to be prosecuted for weapons possession, they could not have a policy of waiting for a subsequent court order, but rather had an obligation to "return the property or commence a lawsuit to retain it."  Pl.'s Opp'n 14.

The Due Process Clause of the Fourteenth Amendment protects "against deprivations of constitutionally protected interests in life, liberty, or property…without due process of law." *Rivera-Powell v. N.Y.C. Bd. of Elections*, 470 F.3d 458, 464 (2d Cir. 2006) (citation omitted). "In assessing a state or local government's compliance with procedural due process, we distinguish between (1) claims based on established governmental procedures, and (2) claims based on random or unauthorized acts by public employees." *G.I. Home Developing Corp. v. Weis*, 499 F. App'x 87, 88 (2d Cir. 2012) (citing *Rivera–Powell*, 470 F.3d at 465). "In the former case, the government may have to provide a pre-deprivation hearing because it can predict when the deprivation of a liberty or property interest will occur. By contrast, when the deprivation is the result of random or unauthorized acts, defendants will satisfy procedural due process so long as [they] provide[ ] [a] meaningful post-deprivation remedy." *Id.* (alterations in original) (internal quotation marks omitted).

42

Here, Plaintiff has abandoned any claim based on a "random or unauthorized" act, seeking relief exclusively on the basis of a Town policy (or decision of a high-ranking policymaker within OPD) to permanently deprive Plaintiff of his seized property without adequate process.  *See* Pl.'s Opp'n 14 (arguing that the "*Paratt/Hudson*" line of Supreme Court cases establishing the "random or unauthorized" jurisprudence is "not applicable herein"); *see also Vaher*, 916 F. Supp. 2d at 437–38 (concluding that Plaintiff's Amended Complaint is best construed as alleging an official policy rather than a "random or unauthorized act").[25]  The upshot is that the availability of adequate post-deprivation remedies is only relevant to—and *not* conclusive of—the procedural due-process issue.  *See Rivera-Powell*, 470 F.3d at 466 ("If we were to determine that the Board's conduct was random and unauthorized…the existence of a meaningful post-deprivation remedy…would automatically satisfy procedural due process.  If, on the other hand, we were to find that the Board's decision was part of an established state procedure, such that the availability of a post-deprivation remedy would not *automatically* satisfy due process, we would merely go on to determine what process was due.") (citations omitted).

Despite anchoring his claim on a supposedly deficient municipal policy, Plaintiff does not even attempt to marshal evidence from the record establishing the existence of such a policy, nor does he attempt to explain how the policy falls short under the standard procedural due-process framework set out by the United States Supreme Court in *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976) (requiring a balance of (i) the private interest affected by the state's deprivation, (ii) the challenged procedure's risk of error plus the value of additional or substitute procedures,

---

[25] Had Plaintiff not abandoned his claim of a "random or unauthorized act," summary judgment would nevertheless be appropriate because "New York law provides property owners with several remedies to recover property seized pursuant to a search warrant."  *Best v. Monaco*, No. 09-CV-05260 (NGG), 2010 WL 1438756, at *2 (E.D.N.Y. Apr. 5, 2010).

and (iii) the state's interest in taking the challenged conduct plus the fiscal or administrative burdens that additional or substitute procedure would impose).  Defendants, on the other hand, at least implicitly take a position on both issues.  First, Defendants deny the existence of a policy, stressing that "the materials which were seized were not retained pursuant to an established municipal policy" but rather "pursuant to court order."  Defs.' Rep. 17; Defs.' Mem. 19–20.[26] Second, by declaring the adequacy of New York's post-deprivation remedies—specifically, an action for replevin or an Article 78 administrative proceeding against the court that issued the warrant justifying the seizure—Defendants imply that the current procedures satisfy the *Mathews* balancing test.  *See* Defs.' Mem. 19 (citing *Moss v. Spitzer*, 19 A.D.3d 599 (2d Dept. 2005); *Boyle v. Kelley*, 42 N.Y.2d 88 (1977)).

 Given the lack of engagement from the parties on the substantive application of the *Mathews* test to the facts here, it is fortunate that the Court need not undertake such a balancing, because Plaintiff cannot sustain this § 1983 claim against the Town under *Monell* or against Chief Nulty in his personal capacity.

### (i) Municipal Liability

"A municipality may be liable under Section 1983 for any 'policy or custom' that causes a 'deprivation of rights protected by the Constitution.'" *Dudek v. Nassau Cty. Sheriff's Dep't*, 991 F. Supp. 2d 402, 411 (E.D.N.Y. 2013) (quoting *Monell*, 436 U.S. at 690–91).  In *Vives v. City of New York*, 524 F.3d 346, 351–53 (2d Cir. 2008), the Second Circuit held that a municipality *cannot* be liable under *Monell* if it merely carries out a state law without any "meaningful" or "conscious" choice, because the municipality does not act pursuant to its own

---

[26] Defendants also argue that, even if they wanted to return Plaintiff's property, they could not without an additional court order. *See* Defs.' Rep. 17–18 (asserting that there is no due process violation because the court order requires OPD to retain custody until another court of competent jurisdiction directs delivery of the property, and "[n]o such order has ever been sought by the Plaintiff or made by a local, state or federal court").

policy in that case.  On the other hand, "the municipality creates such a policy if it makes a 'meaningful' and 'conscious' choice to carry out the law."  *Dudek*, 991 F. Supp. 2d at 411 (citing *Vives*, 524 F.3d at 351, 353).  "For *Vives* to apply as a limit on a municipality's liability under *Monell*, the threshold question is, does the municipality merely carry out a state law?"  *Id.*

In *Dudek*, the federal district court for the Eastern District of New York considered this question in a factual context similar to the one here.  991 F. Supp. 2d at 411.  *Dudek* involved a New York State statute that authorized the Family Court to issue an order suspending a spouse's firearm license and confiscating any firearms he or she may have.  In an apparent "glitch," however, the statute had no language authorizing the Family Court to order the subsequent return of confiscated firearms.  *Id.* at 406.  A spouse who had his firearms confiscated pursuant to a court order made a demand on the Nassau County Sheriff's Department for the return of his rifle and shotgun, following the Family Court's vacating of the original confiscation order.  The Sheriff's Department refused to return the rifle and shotgun without a new court order requiring it.  *Id.* at 407–08.  The spouse then brought a § 1983 action against Nassau County, alleging an "an unconstitutional policy of refusing to return a person's firearms, after the court order to confiscate those firearms is no longer in place."  *Id.* at 405.  The County sought to dismiss the claim by relying on *Vives*, arguing that state law, not a separate municipal policy, required it to wait for a subsequent court order before returning the property.  *Id.* at 410.  The district court rejected this argument because state law only withheld authority from the Family Court, not the Sheriff's Department.  *See id.* at 411–12 ("This provision…deprives the Family Court of authority to direct [the firearms'] return, but leaves intact the authority of the department and the New York Supreme Court to do so.").  Because state courts had "construed from the silence in this provision that the department and the New York Supreme Court each reserve the

independent right to return those firearms," the district court concluded that the plaintiff had

adequately alleged that the Sheriff's Department *did* in fact make a "meaningful" and

"conscious" choice to install a policy of refusing return of the firearms absent a court order.  *Id.*

The situation here is just the opposite of *Dudek*, and the opposite result logically follows.

On March 27, 2007, Defendants were ordered to seize and retain Plaintiff's property pursuant to

New York Criminal Procedure Law ("CPL") § 690.55(1)(b), which authorizes courts receiving

property seized pursuant to a search warrant to "[d]irect that it be held in the custody" of the

government agency that applied for or executed the warrant, "upon condition that upon order of

such court such property be returned thereto or delivered to another court."  *See* Ex. J (ordering

OPD to "retain custody" of Plaintiff's seized magazines and ammunition "and hold the same in a

safe and secure place until such time as the court, or another court of competent jurisdiction,

should direct the disposition or delivery of said items").  Defendants represent that this court

order is still in place, Defs.' Rep. 18 ("No such order has ever been sought by the Plaintiff or

made by a local, state or federal court), which Plaintiff nowhere disputes.  Thus, unlike the

Sheriff's Department in *Dudek* that was not bound by an active court order or state law, OPD

appears to still be so bound, without the freedom to create a policy or additional procedures

governing seized property atop § 690.55(1)(b).  Furthermore, whereas state courts had

determined that the *Dudek* Sheriff's Department was free to return the firearms under state law,

here courts consistently find that the judiciary retains exclusive jurisdiction to dispose of seized

property under § 690.55.  *See U.S. v. $490,920 in U.S. Currency*, 911 F. Supp. 720, 725

(S.D.N.Y. 1996) ("Even if the court directs another person to retain custody of the property, the

property seized pursuant to a search warrant technically remains in the custody of the court, and

the District Attorney or property clerk possesses the property only as an officer of the court,

46

subject to the court's direction and disposition.  New York's statutory scheme, therefore, provides that the disposition of the res is *subject only to orders of the state court*.") (emphasis added) (citations and internal quotation marks omitted); *see also United States v. Benitez*, 779 F.2d 135, 139 (2d Cir. 1985) (noting that § 690.55 provides the court with "the power to retain custody of property seized pursuant to a search warrant"); *Kerr v. Snyder*, No. 1:12-CV-1392 (MAD), 2015 WL 4404342, at *12 (N.D.N.Y. July 17, 2015) ("[P]ursuant to New York's Criminal Procedure Law, property seized pursuant to a search warrant remains in the control of the issuing judge."); *Mirka United, Inc. v. Cuomo*, No. 06 Civ. 14292 (GEL), 2007 WL 4225487, at *3 (S.D.N.Y. Nov. 27, 2007) ("That court, not OAG, retains ultimate custody and control over the seized property."); *Harvey v. Morabito*, No. Civ.9:99CV1913 (HGM/GL), 2003 WL 21402561, at *5 (N.D.N.Y. June 17, 2003) ("Seized property remains under judicial control, but there are various procedural mechanisms one may use to regain possession."); *LM Bus. Assocs., Inc. v. State*, 124 A.D.3d 1215, 1217–18 (N.Y. App. Div. 2015) ("[P]roperty seized pursuant to a court order…cannot be taken away until that custody is ended by a conviction or acquittal, or by an order of the magistrate permitting its surrender to the owner.  In other words, property seized pursuant to a search warrant remains in the control of the issuing judge.  Therefore, even if the seized computers were retained without any legitimate law enforcement purpose, it was beyond the power of [defendant] to take the property from the custody of the law and return it to claimants without proper judicial authorization.") (citations and internal quotation marks omitted) (alteration in original).  OPD was thus required by court order to retain custody of the seized property, and Plaintiff nowhere explains what authority OPD could wield to deviate from state law by effecting a return of his property in contravention of a court order.[27]  *See Vives*, 524

---

[27] The only case that Plaintiff relies on, *McClendon v. Rosetti*, 460 F.2d 111 (2d Cir. 1972), is inapposite for this very reason.  Neither *McClendon* nor its progeny "recognized the 'contours' of a right relating to the return of

F.3d at 354–55 (inquiring "whether the Police Department's policy makers can instruct its officers not to enforce a given section—or portion thereof—of the penal law").

There is, in sum, no evidence that OPD made a "meaningful" or "conscious" choice to erect a policy in which it would always wait for a subsequent court order before returning seized property. To the contrary, the decision was *made for* OPD through application of clear state law and obedience to an active court order. Thus, *Vives* applies to shield the Town from municipal liability under *Monell*.

**(ii) Individual Liability**

The procedural due-process claim against Nulty must also fail for two distinct reasons. First, Plaintiff does not dispute Nulty's testimony that he had no personal involvement in the 2007 Search and Seizure, Ex. F at 25, 28–29, that he has no personal knowledge of OPD's procedure for returning seized property, *id.* at 34–35, and that he has no personal knowledge of what happened to Plaintiff's property, *id.* at 36. *See also* Pl.'s 56.1 Resp. ¶¶ 42, 44, 46. Thus, even though Nulty is in charge of the department that allegedly used unconstitutional procedures, "there is no evidence—aside from his position—showing that he had or should have had knowledge of this particular police department policy." *Razzano v. Cty. of Nassau*, 765 F. Supp. 2d 176, 183 (E.D.N.Y. 2011). "Given this complete lack of evidence, along with the plaintiff's decision not to address this issue in any way, the Court finds that there are no triable issues of fact with respect to [Nulty's] personal involvement in this case." *Id.*

Second, Nulty cannot be held liable on grounds of absolute immunity. "Absolute immunity protects from liability judges, along with any officers who, in performing 'functions'

---

property, where a law enforcement agency's officers had confiscated the property pursuant to a prior *court order*. Indeed, those decisions are distinguishable, in that they involved the refusal to return property, independently confiscated by the officers and not by order of any court." *Dudek*, 991 F. Supp. 2d at 417–18 (citation omitted).

which are an 'integral part of the judicial process' and 'comparab[le] ... to those of the judge,' are allowed the same protection 'derivative of the immunity of judges.'" *Dudek*, 991 F. Supp. 2d at 415 (quoting *Imbler v. Pachtman*, 424 U.S. 409, 420, 423 n.20, 430 (1976)) (alteration in original). "Courts have held that an officer with the sheriff's department does perform such a function to which absolute immunity attaches, when 'acting pursuant to a court order' that he is 'required to execute.'" *Id.* (quoting *Maldonado v. N.Y. Ctty. Sheriff*, No. 05–CV–8377, 2006 WL 2588911, at *5 (S.D.N.Y. Sept. 6, 2006)); *see also Bowers v. U.S.*, 931 F. Supp. 2d 358, 367 (D. Conn. 2013) ("Several district courts in this Circuit have found the execution of valid court orders to entitle sheriffs and others to absolute quasi-judicial immunity.") (collecting cases). Since the Court has already concluded that OPD writ large was merely enforcing a court order in retaining Plaintiff's property, Nulty can be considered an officer performing a "judicial" function, to the extent he was involved at all.  He is thus immune from suit.  *Cf. Dudek*, 991 F. Supp. 2d at 415 (finding no absolute immunity because the Family Court's order had been vacated, leaving the sheriff's department "*without* a directive from any court").


## IV. CONCLUSION

For the reasons set forth above, Defendants' motion for summary judgment is GRANTED.  The Clerk of the Court is respectfully directed to terminate the motion, Doc. 62, and close the case.

It is so ORDERED.


Dated:     September 23, 2015
           New York, New York

                                        _____
                                        Edgardo Ramos, U.S.D.J.